UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

01 JUL 18 PM 4: 13

. . . . . . . . . COURT
. . . OF ALABAMA

|                                          |   |
|------------------------------------------|---|
| MARTHA S. CASE,                          | ) |
|                                          | ) |
|     Plaintiff,       | ) |
|                                          | ) |
| vs.                                      | ) |
|                                          | ) |
| FREESTYLE ENTERPRISES, INC.,             | ) |
| d/b/a NEW HORIZONS LEARNING              | ) |
| CENTER; WILLARD B. DAWES,                | ) |
|                                          | ) |
|     Defendants.      | ) |

CASE NO. CV 99-B-2713-NE

**ENTERED**

JUL 18 2001

## MEMORANDUM OPINION

Currently before the court is the Motion for Summary Judgment filed by defendants,

Freestyle Enterprises, Inc., d/b/a New Horizons Learning Center ("New Horizons"),[1] and Willard

Dawes ("Dawes").[2] The present action arises out of claims asserted by Martha Case ("plaintiff" or

"Case"), against defendants under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.

---

[1] New Horizons is actually a franchisee of New Horizons Computer Learning Center, Inc., formerly known as New Horizons Franchising, Inc. (*See* Affidavit of Robert McMillan ("McMillan Aff."), attached to Brief in Support of Motion for Summary Judgment by franchisor New Horizons Computer Learning Centers, Inc. at ¶¶ 1-4.) New Horizons (the franchisor) was dismissed from the case by Order entered May 31, 2000. Because plaintiff's attorney has indicated that plaintiff does not intend to appeal the May 31, 2000 decision, the court will not enter a Memorandum Opinion in support of its Order.

[2] New Horizons and Dawes will collectively be referred to throughout this Memorandum Opinion as "defendants."

§ 2000e *et seq.* Case alleges that New Horizons is liable for unlawful sexual harassment. Case

further asserts that Dawes and New Horizons are liable for invasion of privacy under Alabama law.

Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the

relevant law, the court is of the opinion that defendants' Motion is due to be granted.

## I. FACTUAL SUMMARY

New Horizons is in the business of selling franchises and providing instruction and training

to purchasers of the franchises. (*See* McMillan Aff. at ¶ 3.) In 1997, before Case began working

with New Horizons, she learned from a friend that Dawes was interested in dating her. (PX 1 at 38-

40.)[3] Additionally, Dawes told Case several times that he wanted to go out with her. (*Id.* at 43-44.)

A romantic relationship developed between Case and Dawes when Case flew to California and met

Dawes while he was on business. (*Id.* at 44-46.) When she returned from California, Case began

dating Dawes exclusively; simultaneously, she began working with New Horizons as a consultant.

(*Id.* at 38, 41-47.) In the fall of 1997, Case became a full time employee of New Horizons as its

Director of Marketing. (*Id.* at 53.)

---

[3] Case filed Plaintiff's Evidentiary Submissions in Opposition to Summary Judgment on February 22, 2001. Throughout this Memorandum Opinion, this evidence will be referred to as "PX," followed by the corresponding tab number. The various defendants filed a number of evidentiary submissions. However, this Memorandum Opinion only references the Evidentiary Submission in Support of Defendants' Motion for Summary Judgment filed on February 1, 2001, by franchisee New Horizons. Throughout this Memorandum Opinion, this evidentiary submission will be referred to as "DX," followed by the corresponding tab number.

2

In late 1997, Case and Dawes began having problems in their personal relationship. (PX 1 at 47-49.) On March 8, 1998, Case wrote Dawes a letter complaining about Dawes's treatment of her and suggesting that she and Dawes should "step back [from their relationship] and see what happen[ed]. (*Id*. at 64-67; DX 2 at 1A.) Case stated that she wanted to "get Will's attention" and try to "salvage the relationship." (*Id.* at 66.) Shortly thereafter, Case began dating Colonel Rick Davis ("Davis"), a customer she met on a sales call with Dawes. (*Id.* at 74.) Case kept the fact that she was dating Davis a secret from Dawes until May of 1998. (*Id*. at 74-76; 81-82.)

On May 14, 1998, Case informed Dawes that she had a date that evening. (PX 1 at 77-78.) Case stated that during the course of their date, Dawes followed her, paged her, and called her between twenty-five and fifty times at Davis's house. (*Id*. at 77-79.) Case also stated that, the next day, Dawes said to her, "How dare you stay at [Davis's] house." (*Id.* at 82.) On May 16, 1998, Davis sent flowers to Case at work. (*Id.* at 83.) Case claims that when Dawes learned that Davis sent her flowers, he "went ballistic." (*Id*.) Case stated that Dawes's behavior was "uncontrollable;" she also stated that she felt that such behavior was a result of Dawes's hurt and jealousy over the end of their relationship and Case's relationship with another man. (PX 3 at 13-15, 21.)

Case stated that Dawes frequently went to her apartment or sat in the parking lot waiting for her to get home from dates with Davis. (PX 1 at 84-85.) On June 10, 1998, Dawes appeared at her door "drunk and verbally abusive." (*Id.* at 85.) The following morning, Dawes called Case at 5:30 a.m. and ordered her to immediately come to the office. (*Id.*) When Case arrived at 7:00 a.m., Dawes told her that she was fired and called her a "fucking bitch" and a "whore." (*Id.* at 86-87.)

3

Case further stated that Dawes told her, "You don't date me, you don't work here." (PX 1 at 90; PX 3 at 15, 18.) Shortly thereafter, Dawes returned to Case's office, rescinded his prior statement, and said, "Look, I've made a mistake. I don't want you to be fired. I want to work things out [and] I want you to stay on."[4] (PX 1 at 88.) Case acknowledges that all of this conduct, including the alleged termination, was prompted by jealousy that put Dawes in a "very emotional state" because she "chose to date somebody other than [Dawes]." (PX 3 at 15, 20-21.) Following this incident, Case continued to work for New Horizons without losing any pay. (PX 1 at 90.)

Subsequently, the relationship between Dawes and Case improved. (PX 1 at 97-98, 111-14.) They occasionally dated and had dinner. (*Id.* at 112-14; PX 3 at 48-49.) In late June and early July of 1998, Case and Dawes attended "couples counseling" with a psychologist. (PX 1 at 99-104; PX 3 at 44-48.) Case stated in a joint counseling session that she would like to see if she and Dawes could "work anything out." (PX 3 at 46.) During July and August of 1998, Case had several dinner dates with Dawes, they held hands, and Dawes bought flowers for Case. (PX 1 at 111-114.)

Case stated that the "true verbal abuse" began when she started seeing Davis again in the fall of 1998. (PX 1 at 122-23.) She stated that Dawes began listening to her voice mail and

---

[4] Dawes denies terminating Case. Dawes contends that Case told him that she wanted to "turn in her notice," to which he replied that notice was unnecessary. (DX 6 at ¶ 3.) Nevertheless, it is undisputed that the two later had a discussion wherein Dawes told her that he wanted her to stay. (DX 6 at ¶ 3; PX 1 at 88.) Case stated that she believes that Dawes changed his mind because he sobered up; she does not claim she had to date or sleep with him to keep her job. (PX 1 at 88; PX 3 at 27-29.)

checking her email.[5]  (*Id.* at 123, 126-27; PX 3 at 21.)  Case also stated that she was not allowed to

have personal telephone calls. (*Id.* at 126-27.)  Case further stated that Dawes came into her office,

pounded his fists on her desk, and while "talk[ing] through his teeth" said, "You goddamn fucking

bitch, how dare you do this to me." (PX 1 at 126-28.)  Case stated that Dawes also told her, "You

have to tell me when you get here; you have to tell me when you leave; you have to tell me when

you go to lunch. . . . I have to approve everything." (*Id.* at 131-33.)[6]

On September 25, or 26, 1998, while eavesdropping on a meeting in the New Horizons

conference room, Case overheard something that made her think that Dawes and the Chief

Financial Officer were plotting to have her followed. (PX 3 at 59-60, 62–65.)  She heard Dawes

say, "You don't have to go along with this, but this way we'll know if she sees an attorney." (*Id.* at

63.)  After hearing this, Case decided to follow through with her prior plans to see an attorney. (*See*

*id.* at 57-70.)  Case told Dawes that she was going to see her mother, but instead visited an attorney.

(*Id.* at 58-61.)  When she returned from her attorney's office, Dawes confronted Case and stated, "I

---

[5] Case's basis for the voice mail allegation is that Dawes told her, "You had a message from your boyfriend. . . . I want that goddamned bastard to stop leaving messages . . . at my business. You can't have personal messages anymore." (PX 3 at 35.)  According to Dawes, he did not listen to a message from Davis; rather, Davis left a message for Case in the company's general voice mail box at the main switchboard.  (DX 6 at ¶ 4.)  Dawes contends that the office manager told him that Case had a message from Davis in the general mailbox, and that Dawes then instructed the office manager to forward it to Case and explain that it had been left in the general mailbox.  (*Id.*)

[6] Dawes admitted that he began to more closely monitor the comings and goings of Case, as he suspected that she was meeting with a competitor, Executrain. (DX 6 at ¶ 4.)  Case admitted that she was talking to Steve Thornberry of Executrain in September, 1997.  (PX 1 at 140, 141.)

can't believe you are using your mother as an excuse and instead you went to see an attorney." (*Id.*
at 65-66; *see also id.* at 61.) Case contends that Dawes confronted her before he received the
charge, and she also alleges that Dawes had her followed. (*Id.* at 58-66.)[7] Case visited her attorney
a few days later, at which time she signed a charge of discrimination and had it hand delivered by
her attorney's office to Dawes on October 1, 1998. (*Id.* at 72-73.)

Following receipt of the discrimination charge, Dawes restructured the top management of
New Horizons and inserted Craig Brubeck ("Brubeck") as General Manager. (PX 3 at 67, 78-80.)
Thus, Case then reported to Brubeck instead of Dawes. (*See id.* at 78-82.) Her pay, benefits, title,
and job duties remained the same. (*Id.* at 80.)

Brubeck began supervising Case around the second week of October, 1998. (DX 6 at ¶ 5;
DX 7 at ¶ 2.) Case claims that Brubeck retaliated against her by leaving her out of management

---

[7] Case testified:

> Q. Do you have any basis for saying that they followed you to Rebekah's office
>    on some other day?
>
> A. The fact that before Will was ever served with this – before he knew
>    anything, he knew what I had done. He told me.
>
> Q. He knew what you had done?
>
> A. He said, "I can't believe you are using your mother as an excuse and instead
>    you went to see an attorney." He knew this, you know.

(PX 3 at 65-66.)

meetings and waiting until the last minute to give her work assignments.  (PX 3 at 82; 95-104.)[8]

Although she generally claims to have been excluded from a wide variety of sales and other

meetings, Case does not cite to any meeting from which she was excluded.  (*See id.* at 86-88, 109,

115.)  It is undisputed that following her charge of discrimination, Dawes had little or no contact

with Case and did not harass her.  (*See* PX 3 at 84.)  Case resigned her employment on November 5,

1998, approximately three weeks after she began reporting to Brubeck.[9]  (DX 7 at ¶ 2.)  Case stated

that she resigned because she was "left out of all management meetings and communications."  (DX

2 at 55.)  In a letter to Dawes, Case stated:

> I am writing to inform you that I will not be returning to my position as Director of
> Marketing at New Horizons.  As you know, prior to October 14, 1998, my position
> was equal to that of Director of Sales, which was held by Craig Brubeck.  However,
> subsequent to my filing a Charge of Discrimination with the EEOC, Brubeck was
> made General Manager and became my supervisor, effectively demoting me.
> Further, since I filed my Charge of Discrimination, I have been left out of all
> management meetings and communications.  My electronic mail has not been
> restored to my computer, preventing me from communicating with many of my
> clients.
>
> Because of these actions, my working conditions have become intolerable and I am
> compelled to resign my position effective immediately.  I consider myself to have
> been constructively discharged.  I expect to be compensated immediately for all
> salary, commissions, and vacation to which I am entitled.

------

[8]  However, Case also stated that Brubeck was "always polite," "always professional," and "never
hostile or abusive."  (PX 3 at 94.)

[9]  Case began searching for a job in the summer of 1998, before she had even been assigned to work for
Brubeck. (*See* PX 1 at 137-39.)

(*Id.*)  Case stated that she believes that Dawes's treatment of her, including Dawes's alleged termination of her, his reaction to her dating Davis, and his acts of opening and reading her e-mail and voice mail, were the result of jealousy and in reaction to Case's attempts to end the relationship. (PX 3 at 12-13, 20-21.)  Case acknowledged that she did not have to engage in sex or give in to Dawes's pleas to resume the relationship in order to keep her job.  (*Id.* at 28-29.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255.  Nevertheless, the nonmovant

need not be given the benefit of every inference but only of every reasonable inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. DISCUSSION

### A.     Sexual Harassment

Title VII of the Civil Rights Act of 1964, as amended, prohibits employer discrimination

"against any individual with respect to his compensation, terms, conditions, or privileges of

employment because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court

set forth the analytical framework to be followed in cases involving discrimination based on

harassment by a supervisor in the companion cases of *Faragher v. City of Boca Raton,* 524 U.S.

775 (1998) and *Burlington Industries v. Ellerth,* 524 U.S. 742 (1998). However, the threshold

question is whether discrimination has, indeed, occurred. *See Burlington Industries,* 524 U.S. at

754. Further, the Eleventh Circuit has recently noted:

> In *Ellerth* and *Faragher*, the Supreme Court indicated that courts should no longer
> use the labels "quid pro quo" and "hostile environment" to analyze whether an
> employer should be held liable on an employee's Title VII claim concerning a
> supervisor's sex-based harassment. . . . Instead, when analyzing whether an
> employer should be held liable for a supervisor's harassment, courts should separate
> these cases into two groups: (1) harassment which culminates in a "tangible
> employment action," such as discharge, demotion or undesirable reassignment, and
> (2) harassment in which no adverse "tangible employment action" is taken but which
> is sufficient to constructively alter an employee's working conditions. Under this
> analysis, when a supervisor engages in harassment which results in an adverse
> "tangible employment action" against the employee, the employer is automatically
> held vicariously liable for the harassment. In contrast, when the supervisor's
> harassment involves no adverse "tangible employment action," an employer can

9

avoid vicarious liability for the supervisor's conduct by raising and proving the affirmative defense described in the *Faragher* and *Ellerth* cases ("*Faragher/Ellerth* affirmative defense").

*Frederick v. Sprint/United Management Co. & Sprint Communications Co. L.P.,* 246 F.3d 1305, 1311 (11th Cir. 2001).[10]  Plaintiff alleges that "[t]he actions of the employer and the employer's managerial agent William Dawes constituted sexual harassment, created a sexually hostile work environment and constituted illegal discrimination." (*See* Compl. at ¶ 18.)

## *1.    Adverse Tangible Employment Action*

Plaintiff alleges that Dawes's treatment of her when she refused to resume their relationship affected tangible aspects of her employment.  In order to establish a prima facie case of sexual harassment when a plaintiff has been subjected to an adverse employment action, she must establish: (1) that she belongs to protected group; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon gender; and (4) that her reaction to the harassment affected tangible aspects of her compensation, terms, conditions, or privileges of employment. *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1361 (11th Cir. 1994); *see also Ellerth* 524 U.S. at 753-54.  Further, "the longstanding rule in this Circuit, [is] that a victim need not provide evidence of a direct and express sexual demand to make a claim under the 'tangible

---

[10] In *Ellerth*, the Supreme Court explained that the terms "quid pro quo" and "hostile environment" are still helpful for distinguishing between cases in which a supervisor carries out his threat to sanction an employee if she does not submit to his sexual demands ("quid pro quo") and circumstances in which the supervisor does not carry through on his threats ("hostile environment").  *Frederick,* 246 F.3d at 1312 n.1 (citing *Ellerth*, 524 U.S. at 751-53).

employment action' analysis." *Frederick,* 246 F.3d at 1312 (citing *Llampallas v. Mini- Circuits, Lab, Inc.,* 163 F.3d 1236, 1246 (11th Cir.1998)). However, "[w]hether implicit or explicit, there must in fact be some evidence of a threatened or promised impact on employment." *Early v. Morris Newspaper Corp.,* 54 F. Supp. 2d 1261, 1268 (M.D. Ala. 1999). In the case at bar, there is no dispute that plaintiff has met the first two elements. The critical issue is whether Dawes's harassment of plaintiff was based on her gender. The court concludes that it was not.

It is axiomatic that sexual harassment is conduct that would not occur but for the sex of the employee/recipient. *See, e.g., Bolden v. PRC, Inc.,* 43 F.3d 545, 551 (10th Cir. 1994), *cert. denied,* 516 U.S. 826 (1995) (General harassment if not racial or sexual is not actionable.); *see also Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . . because of . . . sex.' We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.") (internal quotations omitted). Further, "[p]ersonal animosity is not the equivalent of sex discrimination and is not proscribed by Title VII. The plaintiff cannot turn a personal feud into a sex discrimination case by accusation." *McCollum v. Bolger,* 794 F.2d 602, 610 (11th Cir. 1986) (internal citation omitted), *cert. denied,* 479 U.S. 1034 (1987).

11

Case cannot establish that any alleged harassment was based upon her gender. Case

admitted that she was not asked or required to compromise herself or to have sex in order to keep

her job. (PX 3 at 28-29.) Although she alleges that Dawes threatened her job and actually

terminated her, she admitted that he quickly revoked the termination. (*See* PX 1 at 88, 90; DX 3 at

15, 18.) Case further alleges that Dawes followed her, repeatedly called her, made threats, and

"went ballistic" over her dating Davis because he was hurt over their relationship ending. (*See* PX

1 at 77-79, 83-87, 90 122-23, 126-28, 131-33; PX 3 at 12-15, 18, 20-21.) She stated:

A.     Basically, for me, it was just uncontrollable behavior. I mean, he -- we have all been
in relationships that haven't worked out. You know, we have all been in
relationships that ended and we wished they hadn't ended, but as adults, we have
behaved ourselves, and we have controlled -- you know, we control ourselves, and
we don't make a spectacle of ourselves, and we don't harass someone else because
of that -- the other person. So I have to assume -- I mean, yes -- you know, I was
hurt too. I mean, I had been -- I had been hurt months before. I had been terribly
hurt months before, but I didn't harass him, and I didn't do the things that he did to
me. So there probably was some hurt, there probably was some jealousy, but overall
it was just uncontrolled behavior that he was exhibiting.

Q.     Well, I am not arguing with you about the behavior. The behavior is what it is. I am
just asking you your impression of why he was doing it.

A.     Again, I think that he just couldn't accept the fact that the relationship was over and
-- and the fact that someone else would send me flowers.

(PX 3 at 12-13.) With these admissions, Case cannot establish that Dawes's behavior is based upon

her gender. *See, e.g., Succar v. Dade County School Board,* 229 F.3d 1343, 1345 (11th Cir. 2000)

("[W]e agree with the district court's finding that [defendant's] harassment of Plaintiff was not the

result of Plaintiff's gender but of responses to an individual because of her former intimate place in that individual's life. . . . In other words, [defendant's] harassment of [plaintiff] was motivated not by his male gender, but rather by [defendant's] contempt for [plaintiff] following their failed relationship; [Plaintiff's] gender was merely coincidental.") (internal citations and quotations omitted); *Kahn v. Objective Solutions, Intl.*, 86 F. Supp. 2d 377, 381-82 (S.D.N.Y. 2000) ("The law against sexual harassment protects an employee from being harassed or coerced by unwelcome sexual advances. [Plaintiff] seeks to alter this purpose to grant to a participant in a completely voluntary relationship with her superior a claim when her employment is terminated at the end of the affair. There is no authority or logic for such an extension. Rejection and discrimination are not synonymous. . . . Participation in a consensual office affair does not constitute actionable gender discrimination when the termination of the affair results in discharge. It may constitute unfair and certainly unchivalrous behavior, but not discrimination because of gender."); *Keppler v. Hinsdale Township High School Dist. 86*, 715 F. Supp. 862, 869 (N. D. Ill. 1989) (gender was not the motivation for harassment over the termination of a love affair; gender was merely coincidental). The court agrees with the analysis provided by the *Keppler* court:

> [A]n employee who chooses to become involved in an intimate affair with her employer . . . removes an element of her employment relationship from the workplace, and in the realm of private affairs people do have the right to react to rejection, jealousy and other emotions which Title VII says have no place in the employment setting. Such an employee, of course, always has the right to terminate the relationship and to again sever her private life from the workplace; when she does so, she has the right, like any other worker, to be free from a sexually abusive environment, and to reject her employer's sexual advances without threat of punishment. Yet she cannot then expect that her employer will feel the same as he did about her before and during their private

13

> relationship. Feelings will be hurt, egos damaged or bruised. The consequences are the
> result not of sexual discrimination, but of responses to an individual because of her
> former intimate place in her employer's life.

*Keppler*, 715 F. Supp. at 869.

Thus, the court is of the opinion that Dawes's conduct did not violate Title VII. Dawes's
treatment of Case was motivated not by Case's female gender, but rather by their failed relationship.
Case's gender was merely coincidental. As such, Dawes's conduct does not constitute sexual
discrimination under the anti-discrimination laws, and defendants are entitled to judgment as a
matter of law as to this claim.

### 2. *No Adverse Tangible Employment Action*

To prevail on a claim of sexual harassment when no adverse tangible employment action is
taken, an employee must present sufficient evidence to show that the harassment suffered,
objectively and subjectively, was severe or pervasive, and, if the employee satisfies her burden, the
employer is entitled to assert the Faragher/Ellerth affirmative defense. *See Frederick*, 246 F.3d at
1313. Thus, plaintiff must show that (1) she belongs to a protected category; (2) she was subject to
unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the
harassment complained of affected a term, condition or privilege of employment; and (5) respondeat
superior, that is, defendants knew or should have known of the harassment and failed to take
prompt, effective remedial action. *See, e.g., Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245-46 (11th
Cir. 1999); *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir.1982). Further, plaintiff must
present sufficient evidence showing that the harassment she suffered was both objectively and

subjectively severe or pervasive. *See Frederick*, 246 F.3d at 1313 (citing *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582-83 (11th Cir. 2000)). Among the factors appropriately considered are whether the discriminatory conduct is frequent or severe, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

If the plaintiff satisfies her burden, the defendant-employer is entitled to assert the *Faragher/Ellerth* affirmative defense. *Frederick,* 246 F.3d at 1313 (citing *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765). In order to be entitled to this defense, a plaintiff must establish two necessary elements: (1) that the employer exercised reasonable care to prevent and promptly correct harassing behavior; and (2) that the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer, or to otherwise avoid harm. *Id.* (quoting *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765) (quotation marks omitted). Both elements must be satisfied for the employer to avoid liability, and the defendant bears the burden of proof on both elements. *Id.*

Case has failed to establish a prima facie case as she was not subjected to severe and pervasive unwelcome sexual conduct that was directed at her based upon her gender. Case alleges that Dawes's allegedly discriminatory treatment arose out of Dawes's jealousy and resentment over the end of their relationship. (PX 3 at 12-13, 15, 20-21.) She does not allege that the cause of the conduct was her refusal to have sex with Dawes or that the conduct was because of her gender. Rather, she claims that Dawes's conduct resulted from the fact that their relationship was ending

15

and he could not accept it. Case does not allege that Dawes made sexual gestures, advances, or

requested sexual favors from Case as a condition of employment. (*See* PX 3 at 28-29.) In fact, Case

admitted throughout her deposition that she previously enjoyed a consensual relationship with

Dawes and that she tried to withdraw from that relationship. Her claim is that Dawes treated her

badly because the relationship was over—not because she is female.

Case's allegations fail to establish that any alleged sexual harassment by Dawes was directed

at her because she is female. While Title VII prohibits sex discrimination, "it is not a shield against

harsh treatment at the workplace." *McCollum*, 794 F.2d at 610. A plaintiff "cannot turn a personal

feud into a sex discrimination case by accusation." *Id.* As noted above, Dawes's treatment of Case

was not the result of plaintiff's gender, but was the result of the failed relationship between Dawes

and Case. Thus, plaintiff's gender was not the impetus for Dawes's conduct. Rather, it was merely

coincidental to that conduct. "[P]ersonal animosity is not the equivalent of sex discrimination and is

not proscribed by Title VII. *Freeman v. Continental Technical Services, Inc.*, 710 F. Supp. 328, 331

(N.D. Ga. 1988) (citing *McCollum*, 794 F.2d at 610). Thus, Dawes's treatment of Case does not

constitute actionable gender discrimination. *See Succar,* 229 F.3d at 1345; *Kahn,* 86 F. Supp. 2d at

381-82; *Keppler,* 715 F. Supp. at 869.

Even assuming that Case could establish that Dawes's alleged harassment was based upon

her gender, her prima facie case still fails because the alleged harassment was not severe or

pervasive so as to alter the terms and conditions of employment. Whether a working environment is

sufficiently hostile or abusive is determined by looking at all of the circumstances. *Mendoza,* 195

16

F.3d at 1245-46. Conduct that is merely offensive is not actionable under Title VII. *Harris,* 510 U.S. at 21 (1993). The evidence in the present case reveals that Case and Dawes enjoyed a consensual intimate dating relationship. (*See* PX 1 at 41-47, 111-14; PX 3 at 44-48.) Case has made no claim that Dawes forced a sexual relationship upon her, and she admitted that her relationship with Dawes was in full bloom by the time she became an employee of New Horizons. (*See* PX 1 at 38-53.) Her complaint is that Dawes was attempting to rekindle their dating relationship after she decided it was over and that he was jealous. Case provides no evidence sufficient to establish that her working conditions were permeated with severe and pervasive sexual harassment. *See, e.g., Mendoza,* 195 F.3d at 1247 (collecting cases) (supervisor's statement "I'm getting fired up," rubbing his hip against plaintiff's hip, making sniffing sound at plaintiff's groin, and staring at plaintiff, collectively insufficient to be severe and pervasive); *Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 264 (5th Cir. 1999) (crude comments and implied threat of retaliation for refusing sexual advances not severe and pervasive); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir. 1998) (statement that plaintiff had the "sleekest ass" in office plus touching plaintiff's breasts insufficient to alter the terms or conditions of the plaintiff's employment); *Weiss v. Coca-Cola Bottling Co. of Chicago,* 990 F.2d 333, 333-35, 337 (7th Cir. 1993) (holding plaintiff's claims that her supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blonde, put his hand on her shoulder several times, placed "I love you" signs in her work area, and tried to kiss her once at a bar and twice at work – were not sufficient for actionable sexual harassment). Based on Eleventh

17

Circuit precedent, the conduct described by plaintiff does not rise to the level of severity or pervasiveness necessary to support a hostile environment claim under Title VII. Thus, defendant is entitled to judgment as a matter of law as to this claim.

**B.     Retaliation.**

Although no count of plaintiff's Complaint specifically asserts a retaliation claim, the statement of facts contained in Case's Complaint, as well as her deposition testimony, alludes to retaliatory treatment.[11] To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in a statutorily protected expression; (2) she suffered an adverse employment action; and (3) there is some causal relationship between the two events. *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) (citing *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997)). Case has not established a prima facie case of Title

---

[11] Specifically, plaintiff asserts:

> When the plaintiff returned to work on May 4, 1998, Dawes began retaliating against the plaintiff. . . . After receiving the charge [of discrimination,] Dawes retaliated against the plaintiff in response to her charge of sexual harassment and discrimination. Dawes began to exclude the plaintiff from management meetings and communications, including continuing to deny her the use of email. Also, on October 14, 1998, one of plaintiff's co-workers, Craig Brubeck, was promoted to acting general manager and given supervisory authority over the plaintiff, effectively demoting her. Brubeck was hired approximately one year after the plaintiff and had considerably less marketing and sales experience than the plaintiff. The plaintiff learned that Dawes and Brubeck decided to reassign one of the plaintiff's sales to another employee.

(Compl. at ¶¶ 11, 14.)

18

VII retaliation, as she suffered no cognizable adverse employment action.  An adverse employment action is an employment decision, such as discharge, or other conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee."  *Gupta*, 212 F.3d at 587 (citations and quotations omitted).

### *a.     Constructive Discharge*

Case claims that she was constructively discharged in that she was forced to resign because "her working conditions worsened and became completely intolerable."  (*See* Compl. at ¶ 16; *see also* DX 2 at 55.)  "Constructive discharge occurs when the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation."  *Pittman v. Hattiesburg Municipal Separate School District,* 644 F.2d 1071, 1077 (5th Cir. 1981) (citing *Young v. Southwestern Savings & Loan Ass'n,* 509 F.2d 140, 144 (5th Cir. 1975)).  In order to establish a constructive discharge, plaintiff must demonstrate that her working conditions were "so intolerable that a reasonable person in her position would have been compelled to resign." *See, e.g., Durley v. APAC, Inc.*, 236 F.3d 651, 658 (11th Cir. 2000) (internal quotation marks omitted).  Constructive discharge is difficult to show if the allegedly intolerable conditions lasted only a short a time.  *Jones v. USA Petroleum Corp.,* 20 F. Supp. 2d 1379, 1383 (S.D. Ga. 1998) (citing *Hill v. Winn-Dixie,* 934 F.2d 1518, 1527 (11th Cir. 1991)).  Moreover, "constructive discharge will generally not be found if the employer is not given sufficient time to remedy the

19

situation." *Id.* (quoting *Kilgore v. Thompson & Brock Management, Inc.,* 93 F.3d 752, 754 (11th Cir. 1996)).

The court concludes that no reasonable jury could find that plaintiff's working conditions were so difficult or unpleasant that a reasonable person would have felt compelled to resign. Throughout her employment, Case never received a pay decrease or negative change in standing with the company. (PX 3 at 80.) She claims that she was "demoted" when Dawes placed Brubeck in the position of General Manager after she filed an EEOC charge.[12] (*Id.*) However, Brubeck's promotion cannot constitute a "demotion" for Case, as her title did not change, her pay did not change, and her duties did not change. *See Seely v. Runyon*, 166 F.3d 348, No. 97-4117, 1998 WL 863974, at *2 (10th Cir. Dec. 14, 1998) (unpublished opinion) ("Obviously a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either. Otherwise every trivial personnel action that an irritable, chip-on-the- shoulder employee did not like would form the basis of a discrimination suit."); *Gartman v. Gencorp., Inc.*, 120 F.3d 127, 129-30 (8th Cir. 1997) (no intolerable environment where employee's title, pay, and benefits remained constant after transfer). The only thing that changed when Brubeck was promoted was the fact that Case no longer had to report to Dawes, her alleged harasser. (*See* PX 3 at 80-82.) In fact, it is undisputed that Case had

---

[12] Plaintiff does not allege that she was discriminatorily denied the promotion given to Brubeck. (*See* Compl. at ¶¶ 17-26.)

no further contact with Dawes after the restructuring and that the alleged harassing behavior ceased. (PX 3 at 84.) Case did not give the new reporting structure a chance, as she voluntarily quit her job just three weeks after Brubeck became her supervisor.  (DX 7 at ¶ 2.)  Thus, at the time she quit, the alleged harassment by Dawes had ceased and she had suffered no tangible employment loss.  Under these circumstances, it cannot be said that a reasonable person would have felt compelled to resign. Moreover, "[a]lthough Title VII sexual harassment and constructive discharge are separate issues, to be decided separately, where a plaintiff is unable to support a hostile work environment claim, she is also unable to support a claim of constructive discharge." *Matthews v. City of Gulfport,* 72 F. Supp. 2d 1328, 1338 (M.D. Fla. 1999).

### b.     Other Incidents

Case also asserts a litany of incidents that she contends are retaliatory in nature.  These include Dawes's monitoring her voicemail and email, Dawes's close supervision of her whereabouts during work hours, being left out of management meetings, and not being given enough time to complete assignments.  (*See* PX 3 at 56-119.)  These incidents do not constitute actionable retaliation under Title VII.  The Eleventh Circuit has confirmed that Title VII's protection against retaliation extends to adverse actions that fall short of ultimate employment decisions.  *Graham v. State Farm Mut. Ins. Co.,* 193 F.3d 1274, 1283 (11th Cir. 1999).  "Thus, actions such as undeserved negative job evaluations, demotions, disadvantageous transfers, or toleration of harassment are actionable under the retaliation clause."  *Id.*  However, "some threshold level of substantiality . . . must be met for unlawful discrimination to be cognizable under the anti-retaliation clause."  *Id.*;

*Gupta,* 212 F.3d at 587; *see also Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455-56 (11th

Cir.1998) (retaliatory actions included written reprimands, suspension, soliciting negative comments

from coworkers, threatening to shoot plaintiff in the head, and delaying approval of medical

treatment).

In evaluating what actions meet the required level of substantiality, courts recognize that

Title VII is "neither a 'general civility code' nor a statute making actionable the 'ordinary

tribulations of the workplace.'" *Gupta*, 212 F.3d at 587 (citing *Anderson v. Coors Brewing* Co., 181

F.3d 1171, 1178 (10th Cir. 1999)).  Case has alleged no retaliatory actions that are objectively

serious and tangible enough to meet the required level of substantiality.  She alleges no actions

which had the effect of altering her compensation, terms, or conditions of employment, or

"depriv[ing] . . . her of employment opportunities or adversely affect[ing] . . . her status as an

employee." *See Gupta*, 212 F.3d at 588.  Thus, plaintiff has failed to establish a cognizable claim of

retaliation and defendant is entitled to judgment as a matter of law as to this claim.

### C.    Invasion of Privacy

Case asserts a tort claim under Alabama law for invasion of privacy against defendants.

Under Alabama law, the tort of invasion of privacy consists of four distinct wrongs:  (1) intruding

into the plaintiff's physical solitude or seclusion; (2) giving publicity to private information about

the plaintiff that violates ordinary decency; (3) putting the plaintiff in a false, but not necessarily

defamatory, position in the public eye; or (4) appropriating some element of the plaintiff's

personality for a commercial use. *Cash v. Smith,* 231 F.3d 1301, 1308 (11th Cir. 2000) (citing

*Johnston v. Fuller*, 706 So. 2d 700, 701 (Ala. 1997)).  In the context of sexual harassment, the tort

of invasion of privacy falls into the category of an intrusion into the plaintiff's physical solitude or

seclusion.  *See Phillips v. Smalley Maintenance Services, Inc.*, 435 So .2d 705, 708-712 (Ala. 1983).

In one of the first cases to address invasion of privacy in the context of sexual harassment, the

Alabama Supreme Court found that intrusive and coercive sexual demands or inquiries may

constitute an invasive examination into "private concerns."  *Id.* at 711.[13]  Subsequent cases instruct

that "[t]here must be something in the nature of prying or intrusion and the intrusion must be

something which would be offensive or objectionable to a reasonable person.  The thing into which

there is an intrusion or prying must be, and be entitled to be, private."  *See Hogin v. Cottingham*,

533 So. 2d 525, 531 (Ala. 1988) (citations and quotations omitted).  Further, the Alabama Supreme

Court has "defined the tort as the wrongful intrusion into one's private activities in such a manner as

to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities."

*See McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 651 (Ala. 1986).

Case has asserted no sexual comment, no physical touching, and no physical or sexual

intrusion by Dawes that would constitute an actionable invasion of privacy.  Although Dawes spoke

---

[13] In *Phillips,* the plaintiff's supervisor called her into his office on numerous occasions, locked the door, covered the windows, and questioned her about her sexual relationship with her husband.  *Id.* at 707.  On many occasions he inquired as to sexual positions and as to whether they engaged in oral sex.  *Id.*  Plaintiff's supervisor invited the plaintiff to have a drink, and threatened her job if she did not engage in oral sex with him.  *Id.*  Plaintiff's supervisor further asked the plaintiff if she was going to "show gratitude" to him by engaging in certain sexual acts.  *Id.*  This severely intrusive conduct was sufficient to support an invasion of privacy claim.

and wrote of his desire to continue their personal relationship, he made no sexual advance or proposition that rises to the level of invasion of plaintiff's privacy. *See McIsaac*, 495 So. 2d at 651 (no invasion of privacy where supervisor asked out plaintiff, told her he wanted to have an affair with her, leered at her suggestively, and tried to kiss her). In the present case, the alleged intrusion and examination into Case's private concerns falls short of that required to constitute an invasion of privacy. Thus, defendants are entitled to judgment as a matter of law as to this claim.

## IV.  CONCLUSION

For the foregoing reasons, the court is of the opinion that defendants' Motion for Summary Judgment is due to be granted. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this  18th day of July, 2001.


Sharon Lovelace Blackburn
_____
**SHARON LOVELACE BLACKBURN**
United States District Judge

24